UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-10791-RGS

JOSEPH DaROSA, WILLS CLERVIL, ALKA DAVIS,
MARTIN SCHUTZIUS, and DANIEL SCHULZ,
on behalf of themselves and
similarly situated employees

v.

SPEEDWAY LLC

MEMORANDUM AND ORDER ON
PLAINTIFFS' MOTION FOR CLASS CERTIFICATION
and
DEFENDANT'S MOTION FOR DECERTIFICATION

August 30, 2021

STEARNS, D.J.

Plaintiffs Joseph DaRosa, Wills Clervil, Alka Davis, Martin Schutzius, and Daniel Schulz, former General Managers (GMs) of convenience stores operated by defendant Speedway LLC, allege that they were misclassified as exempt salaried employees to their financial disadvantage. They seek to represent other similarly situated employees in a national collective pursuant to the Fair Labor Standards Act (FLSA), and statewide classes under the wage laws of Massachusetts, New York, Illinois, Pennsylvania, and New Jersey. Before the court are plaintiffs' motion for class certification and defendant's motion to decertify the FLSA collective.

## BACKGROUND

Speedway is a national company that operates thousands of convenience stores.  Speedway categorizes the "complexity" of individual stores on a scale of Level 1 to Level 6.  The scale is based on the store's sales volume, aggregate labor hours, turnover/employment, and other operational markers.  Level 1 stores have the lowest sales volume, labor hours, and number of employees, while Level 6 stores are at the opposite end of the spectrum.  The stores are grouped into districts and regions based on their geographic location.  A District Manager (DM) typically oversees a dozen stores.  DMs report to a Speedway Regional Manager.

In April of 2019, DaRosa singly filed the original Complaint as the proposed lead plaintiff.  As the GM of a Level 2 Speedway store in Massachusetts, DaRosa claims that he was misclassified as an exempt salaried employee.  He alleges that he primarily worked alone in the store or with one other employee and spent most of his time performing non-managerial tasks such as assisting customers, operating the cash register, stocking shelves, maintaining inventory, and cleaning.  DaRosa avers that he often worked more than 40 hours a week, and that, had he been properly classified as a non-exempt employee, he would have received overtime pay for the hours over forty that he worked in each week.  He asserts claims under

the FLSA and the Massachusetts Minimum Fair Wage Act.  DaRosa also alleges that all GMs in Level 1 to Level 5[1] Speedway stores are similarly misclassified under the same employment practices.

In February of 2020, this court conditionally certified an FLSA collective of Speedway GMs in level 1 to level 5 stores.  *See* Dkt # 47.  An Amended Complaint, filed in August of 2020, added lead plaintiffs and state wage law claims involving New York (Davis), Illinois (Schutzius), Pennsylvania (Schulz), and New Jersey (Clervil[2]), while asserting the identical set of factual allegations as did DaRosa.  In response to a notice sent to potential members, 1,268 GMs from Level 1 to Level 5 stores in 25 states opted into the FLSA collective.

The parties engaged in substantial representative class discovery.  One hundred eight collective members provided testimony: 45 members submitted sworn declarations,[3] 43 members responded to Speedway's interrogatories, and 19 members (including four of the five lead plaintiffs)

---

[1] Plaintiffs do not allege that GMs of Level 6 stores are misclassified.

[2] Clervil was substituted as the New Jersey lead plaintiff in the Second Amended Complaint filed in April of 2021.

[3] In support of its motion to decertify, Speedway also submitted the declarations of 18 GMs who have not opted to join the FLSA claim.  As they are not members, their testimony has no bearing on whether the opt-in collective is similarly situated.

sat for depositions.   The parties now cross-move on the issue of final certification based on this record.

## DISCUSSION

Under the FLSA, an action against an employer to recover unpaid overtime wages may be maintained "by any one or more employees for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b).  Potential plaintiffs must affirmatively opt in to join an FLSA collective action.  *Id.*

Courts in this Circuit have adopted a two-tiered approach to the certification of a collective in an FLSA action.  *See Kane v. Gage Merch. Servs., Inc.*, 138 F. Supp. 2d 212, 214 (D. Mass. 2001).  At the preliminary "notice stage," the court applies a "fairly lenient" standard to plaintiff's "substantial allegations that the putative class members were subject to a single decision, policy, or plan that violated the law" to conditionally certify a group of potential members who will receive notice.  *Id.*  If a collective is conditionally certified, as was the case here, the defendant may move to decertify the collective after the completion of class discovery.  At this second stage, the court makes a "factual determination" as to whether the employees who have opted into the collective are actually similarly situated.  *Norceide v. Cambridge Health All.*, 2014 WL 775453, at *3 (D. Mass. Feb. 24, 2014)

4

(citation omitted).  In the factual "similarly situated" analysis, the court considers factors including "(1) the disparate factual and employment settings – e.g., whether plaintiffs were employed in the same corporate department, division, and location; (2) the various defenses available to defendant which appear to be individual to each plaintiff; and (3) fairness and procedural concerns."  *Id.* (citation omitted).

The substantive dispute – while not at issue here – informs the "similarly situated" analysis. "The FLSA, in general terms, requires that an employee be paid a minimum hourly wage and overtime compensation if he or she works in excess of forty hours in a work week." *Selfridge v. Jama*, 172 F. Supp. 3d 397, 425 (D. Mass. 2016), citing 29 U.S.C. §§ 206, 207. Employees who are "employed in a bona fide executive . . . capacity" are exempt from the overtime payment requirement.  29 U.S.C. § 213 (a)(1).

> Pursuant to regulations issued by the Secretary of Labor, an employer seeking to establish that an employee is an exempted "executive" must show: (1) the employee's salary is at least [$684] per week, (2) the employee's "primary duty" is management, (3) the employee "customarily and regularly directs the work of two or more other employees," and (4) the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight."

*Marzuq v. Cadete Enters., Inc.*, 807 F.3d 431, 435 (1st Cir. 2015) (citation omitted).

"Typical management duties include interviewing, training, directing work, maintaining records, appraising work performance, handling employee complaints, and apportioning work." *Rooney v. Town of Groton*, 577 F. Supp. 2d 513, 526 (D. Mass. 2008); *see also* 29 C.F.R. § 541.102.

> The term "primary duty" means the principal, main, major or most important duty that the employee performs. . . . Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Marzuq*, 807 F.3d at 436, quoting 29 C.F.R. § 541.700.

Plaintiffs contend that they are all subject to the same Speedway "one size fits all" staffing policy – that is, the GM of any store allocated labor hours equivalent to two full-time employees is classified as exempt. When a store is short-staffed, as is often the case, *see*, *e.g.*, Creller Dep. (dkt # 127-9) at 108; Uddin Dep. (dkt # 127-18) at 35, the GM is expected to take up the slack, working well over forty hours per week. The testimony of the representative opt-ins reflects that the members of the collective worked on average 50 hours or more per week.

Plaintiffs also maintain that, contrary to Speedway's job description, much of their work is not managerial. Of their typical working hours, 60%

to 100% (with most of the representatives reporting 90% or more) are spent on the same tasks as those assigned to hourly employees: helping customers and working the cash register; stocking shelves and coolers; scanning products; taking out the trash; making food in the food prep area; sweeping the parking lots; and cleaning the store, bathrooms, floors, food prep area, and the gasoline pumps, with time at the cash register soaking up most of the day. *See*, *e.g.*, Baser Dep. (dkt # 127-5) at 30 ("I was working as cash register 16 hours a day, 14 hours a day."); Uddin Dep. at 60 ("[O]ver 90 percent of my time, I was on the register."). Members of the GM collective also reported that most of their hours were spent working either alone or with one other employee.

Plaintiffs paint Speedway GMs as having limited discretion in performing managerial tasks. DMs determine the number of weekly labor hours assigned to each store from which GMs are not permitted to deviate. *See*, *e.g.*, Dimsey Dep. (dkt # 127-10) at 8 ("[I]f we went over that number, we had to explain to our district manager why."). GMs cannot independently hire or fire employees. *See*, *e.g.*, *id.* at 34-35 ("I was supposed to work through HR."); Schulz Dep. (dkt # 123-8) at 193-194 (opining that his evaluation of interview candidates did not carry any weight with the higher-ups); Mercado Dep. (dkt # 127-14) at 43-44 (giving an example of a DM who

7

refused to follow the recommendation to discipline or terminate a problematic employee); Dimsey Dep. at 32-33 (DM hired back two employees who he had fired). GMs are also required to comply with the detailed Customer Ready Worksheets, Operations Manual, Business Planner, and Daily Sales Reports that dictate most aspects of a store's daily operation.[4] *See* dkt ## 123-28, 123-29, 123-30, and 123-31. DMs also visit the stores once or twice a week to ensure that GMs are complying with corporate strictures. *See* McCoart Dep. (dkt # 123-13) at 114.

For its part, Speedway contends that while

[t]he amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee[,] . . . [t]ime alone, however, is not the sole test. . . . Employees who do not spend more than 50 percent of their time performing exempt duties may nonetheless meet the primary duty requirement if the other factors support such a conclusion.

---

[4] Plaintiffs note that under these guidelines and policies, Speedway places many limitations on a GM's authority. A GM, for example, cannot set or change the pricing of merchandise or gasoline, deviate from the corporate pay scale, make bank deposits outside of authorized hours, set store hours, or authorize a cash payout from the store. Speedway, on the other hand, points out that its guidelines and policies also delegate extensive responsibility to GMs, including, such as, the handling of all mail and legal documents, maintaining adequate inventory levels, completing accident reports and obtaining relevant statements, overseeing alarm and security systems, handling counterfeit currency investigations, and managing OSHA visits.

*Marzuq*, 807 F.3d at 436, quoting 29 C.F.R. § 541.700; *see also*, *e.g.*, *Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 499 (6th Cir. 2007) (affirming that a Speedway GM who spent "approximately sixty percent of her work time performing non-managerial tasks" nonetheless had management as her primary duty); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1113 (9th Cir. 2001) (affirming a finding that management was the employees' primary duty "despite the fact that the Baldwins claimed that they spent ninety percent of their time on nonexempt tasks"); *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1272 (11th Cir. 2008) (affirming the finding of a violation of the exempt exception but noting a distinction between spending 60% of an employee's time on non-exempt work versus 80-90%).

Speedway also argues that time spent behind the cash register cannot be considered as undifferentiated non-exempt work.  Speedway considers the cash register as the "command center" of each store and expects GMs to supervise the store from the cash register.  *See* DaRosa Dep. (dkt # 123-7) at 9-10 (Speedway wanted managers to spend time manning the "command center" so "they could handle customer complaints, things like that" and "make sure everything was going good"); Shell Dep. (dkt # 127-17) at 29-30 ("The command center would be where the case registers are at."); Montero

Dep. (dkt # 127-15) at 28 ("When I was at the register, [when] I wasn't serving a customer, I could see what everybody was doing, so I knew whether they got it done or not."); *see also Donovan v. Burger King Corp.*, 672 F.2d 221, 226 (1st Cir. 1982) ("[A]n employee can manage while performing other work, and that this other work does not negate the conclusion that his primary duty is management.").

Speedway additionally highlights numerous differences in the GMs' working environments.  The opt-in members hail from 25 states, working at stores that serve large metropolises (e.g., plaintiff Uddin in Philadelphia, PA) as well as significantly smaller townships (e.g., plaintiff Schulz in Camp Hill, PA).  The stores themselves are not uniform in size or layout.  *See* Schulz Dep. (dkt # 123-8) at 105 (agreeing that the store at which he trained and the store at which he worked were "remarkably different in terms of the leadership structure and the volume of the store"); DaRosa Dep. at 198-199 (characterizing his store as "different" and a "disaster" compared to others). Fundamentally, the stores assigned to the five different levels have different sales volumes and labor hours.  Plaintiff Creller's store has an associated warehouse.  Creller Dep. at 46, 75.  Plaintiff Greene's store has a café section. Greene Dep. (dkt # 127-11) at 37.   Some stores are open 24-hours, *see* Bressman Dep. (dkt # 127-6) at 23; Creller Dep. at 20; Davis Dep. (dkt 123-

9) at 53; Greene Dep. at 22; Khan Dep. (dkt # 127-13) at 8, and some are not, *see* Carter Dep. (dkt # 127-7) at 50; Dimsey Dep. at 15; Montero Dep. at 18; Sellers Dep. (dkt # 127-16) at 35-36.

The stores also vary widely in their number of employees.  While plaintiff Baser attested to having had only two employees at his Level 4 store, Baser Dep. at 62-63, plaintiff Greene (who worked at a Level 1 and a Level 4 store at different times) remembered seven to ten employees at one store, while the other was allocated two co-managers, three shift leads, and had a roster of up to 18 customer service representatives.  Greene Dep. at 22, 37-38.

With respect to hiring or promoting employees, some representatives denied having any hand.  *See*, *e.g.*, Creller Dep. at 19 ("We didn't do any hiring.  We didn't do any interviewing or training or anything like that."); Carter Dep. at 14 ("Hiring was done by the recruiting office.").  According to Clervil, while acknowledging that the company recruiting office had the final say because of the required background check, "if you're a manager, [hiring new employees is] what you got to do."  Clervil Dep. (dkt # 123-10) at 109-110 ("[Y]ou have to interview the people you want to bring, you want to be part of your team.").  Kahn testified to "always" evaluating a candidate and having made the final decision to hire more than one employee.  Khan Dep.

at 16-20. Khan also recounted having promoted an employee to a lead assistant manager at his store, and having his recommendation to further elevate the individual to a GM adopted. *Id.* at 25-27; *see also* Carter Dep. at 73-74 (having trained a CSR to become a shift leader).

Some GMs, such as Davis, were "absolutely not" involved in training and supervising employees. Davis Dep. at 7. Schulz recounted delegating the training of new hires to two experienced employees. Schulz Dep. at 256. Greene personally "was instilling a this is the way it is or you can't work here kind of thing" and impressed upon new employees his "very high expectations and standards." Green Dep. at 21. Khan also emphasized that he "[p]ersonally . . . I train[ed] them, everything." Khan Dep. at 21. While Khan testified to having been given little leeway in scheduling his employees, *see id.* at 82-83, Dimsey set the schedule for his employees three weeks out, Dimsey Dep. at 14, and Greene explained that he would "try to . . . reshift people" in response to quarterly sales reports, Greene Dep. at 44.

GMs also engage in different levels of involvement in appraising employee performance. At Creller's store, her DM "did all the appraisals." Creller Dep. at 36. Likewise, Bressman testified that to evaluate his assistant managers, he "was told to write down – from [his] district manager [] how well they followed the workbook, how well they interacted with my other

12

team members and completion of the workbook." Bressman Dep. at 31.  For

Khan, when an assistant manager's appraisal comes due, he prints it out, and

goes through the "32, 30 questionnaire[s]," – "I do go through everything.

How we [are] doing.  What, where she need[s] . . . help.  And I offer help."

Khan Dep. at 27-28; *see also* Greene Dep. at 33 (agreeing that he conducted

evaluations for employees and made recommendations for promotion).

With respect to employee discipline and terminations, GMs similarly

reported varying levels of engagement.  Choplin testified that she was not

allowed to do anything without going through her DM.  Choplin Dep. (dkt #

127-8) at 29-30.  Khan, on the other hand, explained that he provides one-

on-one coaching to employees to address performance issues.  Khan Dep. at

41-45 ("We have to stand next to her or him and show them like, you know,

how do we finish that transaction. . . . I have to show them, like go slow, do

it that way.  And I mean, if you don't understand, then I next to him, like, you

know, how we scan, it goes like this.  It's hand-to-hand training.").  DaRosa

"had people that [he] couldn't fire that were sitting on [his] staff that [he]

had to keep scheduling," DaRosa Dep. at 12-13, while Greene testified that

every recommendation that he had made to terminate an employee was

approved so long as he had appropriately documented their shortcomings,

Greene Dep. at 30-31 ("I wouldn't be able to  tell you how many people I terminated, but I'm sure it was quite a bit.").

GMs also have differing relationships with customers and vendors. While Baser testified that "mainly corporate handled" customer complaints, Baser Dep. at 68, Khan had the authority to resolve incidents involving less than $25 in compensation, *see* Khan Dep. at 49-50.  Greene did not identify any limitations in his dealing with customer complaints. *See* Green Dep. at 24.  Creller took no role in ordering merchandise or dealing with vendors. *See* Creller Dep. at 47 ("It was all based off of sales.").  In contrast, Khan considered vendor relationships to be a central focus of his job. *See* Khan Dep. at 47 ("You know, like the vendor relationship is very important because we want the right product.").

GMs similarly reported receiving variable levels of supervision from their DMs.  Creller spoke to her DM daily because her store was "ran (sic) by the district manager."  Creller Dep. at 34-35.  Choplin reached out to and relied on advice from her DM to help make decisions at her store.  *See* Choplin Dep. at 33.  In contrast, Carter "would never see [his DM]," Carter Dep. at 44; Greene saw his DM "once every three, four months," Greene Dep. at 28-29; and Montero never saw much of his DM – "[t]he less your saw your district manager, the better you were doing," Montero Dep. at 33.

Here we reach the bottom line: The "[d]etermination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole." *Marzuq*, 807 F.3d at 436, quoting 29 C.F.R. § 541.700.   Considering the representatives' disparate testimony that on an individual basis they undertook and exercised varying degrees of responsibility and authority in the management of their Speedway stores, the court cannot conclude that there is a consistent answer to the question whether the 1,268 opt-in plaintiffs were properly classified as exempt employees.   Any fair adjudication would necessarily involve the specific circumstances of each GM's employment given the disparate employment experiences they report. "Such inquiries would undermine the purpose of a collective action to streamline adjudication of the claims of class members." *Norceide*, 2014 WL 775453, at *4.

For substantially the same reason, the court also cannot certify the proposed classes based on the parallel state law claims.  Under Fed. R. Civ. P. 23(a), "[q]uestions are common if they can "each be answered either 'yes' or 'no' for the entire class" and "the answers will not vary by individual class member." *Walker v. Osterman Propane LLC*, 411 F. Supp. 3d 100, 108 (D. Mass. 2019) (citation omitted).  Here the answers are "yes," "no," "maybe,"

and "it depends."  In other words, we do not have in these answers the seamless garment in which a true collective action must be clothed.

## ORDER

For the foregoing reasons, defendant's motion to decertify the FLSA collective is <u>ALLOWED</u>, and plaintiffs' motion to certify classes under state law claims is <u>DENIED</u>.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE